IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 12, 2006

## STATE OF TENNESSEE v. HAROLD HACK

**Direct Appeal from the Circuit Court for Madison County**
**No. 04-701     Donald H. Allen, Judge**

―――――――――

**No. W2005-02801-CCA-R3-CD  - Filed December 5, 2006**

―――――――――

A Madison County jury convicted the Defendant, Harold Hack, of three counts of vehicular homicide, one count of aggravated assault, one count of felony reckless endangerment, and one count of violating the open container law.  For these convictions, the Defendant received an effective sentence of twenty-four years as a Range I, standard offender to be served in the Department of Correction. In this direct appeal, the Defendant challenges the sufficiency of the evidence and contends that his sentence is excessive.[1]  After a review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which JERRY L. SMITH and THOMAS T. WOODALL, JJ., joined.

Gregory Gookin, Assistant Public Defender, Jackson, Tennessee, for the appellant, Harold Hack.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Jerry Woodall, District Attorney General; and Anna Banks, Assistant District Attorney General, for the appellee, State of Tennessee.

―――――――――

[1]We note that the judgments of conviction were entered on September 2, 2005, and the motion for new trial was filed on October 5, 2005.  Accordingly, it appears from the record before this Court that the Defendant's motion for new trial was filed more than thirty days after the judgments of conviction were entered.  See Tenn. R. Crim. P. 33(b) (a motion for new trial "shall be made . . . within thirty days of the date the order of sentence is entered").  Despite an untimely motion for new trial, this Court may review the issues of sufficiency of the evidence and sentencing.  State v. Boxley, 76 S.W.3d 381, 390 (Tenn. Crim. App. 2001) (citation omitted).

**OPINION**

At approximately 3:30 p.m. on March 25, 2004, Officer Brandon Moss of the Jackson Police Department received a report of a vehicle accident on North Highland Avenue in the area of North Side High School. According to Officer Moss, traffic in that area is very heavy at this time of day.

Officer Moss arrived on the scene approximately six minutes after receiving the call and observed that two vehicles had been involved in a violent collision. He parked his vehicle, exited, and approached one of the vehicles, a 1996 Chrysler minivan. The occupants of the minivan were Charles and Bennie Vinson. Prior to Officer Moss' arrival, Charles Vinson had been removed from the vehicle and laid on the ground. Officer Moss attempted to render aid to Mr. Vinson, but he was unable to detect a pulse and observed that Mr. Vinson was not breathing. Mrs. Vinson was conscious but trapped inside the vehicle. The officer asked her if she was okay, and he tried to calm her down. Officer Moss then approached the second vehicle, a 1995 green Ford Taurus, driven by the Defendant. Inside the Taurus, he saw the Defendant's wife, Clayola Harris,[2] who appeared to be dead in the passenger seat. Sara Fritz was "semiconscious" and trapped in the back seat of the vehicle. Officer Moss observed a cooler behind the driver's seat of the Defendant's car. The cooler contained a couple of cans of beer. Although Officer Moss was uncertain by the time of trial, he believed that one of the cans was open.

Mrs. Vinson was extricated from the vehicle and taken to Jackson Madison County General hospital. After being stabilized, she was transferred to the Regional Medical Center in Memphis, where she died from her injuries over two months later. Sara Fritz suffered a fractured femur, which required surgery. Ms. Fritz recovered from her injuries; however, she died from an unrelated cause prior to trial.

According to Officer Moss, the impact of the collision rotated the minivan 180 degrees in the other direction. The Taurus was also "rotated around" and ended up in the grass near a parking lot. Both vehicles were badly damaged.

Officer Moss spoke with the Defendant in the emergency room following the accident. The Defendant stated to Officer Moss that he did not remember anything about the crash, and Officer Moss smelled an odor of alcohol about the Defendant's person. The Defendant admitted that "he had had a few beers earlier in the day." The Defendant did not inquire about his wife, Ms. Fritz, or the Vinsons. The Defendant signed the implied consent form and agreed to have his blood drawn for testing. Blood was taken from the Defendant at 5:40 p.m., approximately two hours after the collision.

Lieutenant James D. Hale of the Jackson Police Department also spoke with the Defendant at the hospital. According to Lt. Hale, the Defendant was evasive when asked about the accident. The Defendant replied "just that he had had a wreck." Lt. Hale then asked about the passengers in

---

[2]Clayola Harris is also referred to as Clayola Hack throughout the record.

the Defendant's vehicle–his wife and Ms. Fritz. Then Defendant responded, "I was in the car by myself. My wife and Ms. Fritz are at home." Lt. Hale stated that the Defendant was not hesitant in his answers. Lt. Hale believed that the Defendant was either trying to mislead him or suffering from a concussion and, therefore, stopped questioning the Defendant.

On September 7, 2004, a Madison County grand jury returned a seven-count indictment against the Defendant– Count 1, vehicular homicide of Charles Vinson; Count 2, vehicular homicide of Bennie Vinson; Count 3, vehicular homicide of Clayola Harris; Count 4, aggravated assault of Sara Fritz; Count 5, felony reckless endangerment of "another person or persons"; Count 6, reckless driving; and Count 7, violation of the open container law. A jury trial was held in July of 2005.

The State offered several witnesses who testified about the Defendant's driving prior to the crash. Avis Bell testified that she was traveling north on Highland Avenue in Jackson; there were many cars on the street. According to Ms. Bell, she looked into her rearview mirror and noticed a green car "pull out from the traffic behind [her] going at a high rate speed . . . [.]" She then testified,

> Before he got to me, the car pulled over on the inside lane, just swerved in front of other cars, pulled up a little, pulled over into the southbound lane . . . . Two lanes of traffic on both sides. . . . [T]his person swerved into the south lane and finally corrected the car and got back to the inside lane. . . . The car was going at a high rate of speed and went for just a few yards on the lane on the inside lane and all of a sudden made like almost a 90 degree swerve into the southbound lane with two lines of cars and hit a van.

Ms. Bell testified that the green car was going faster than the flow of traffic and that the driver of the vehicle appeared to be preoccupied. She described the Defendant's driving as very reckless.

Carolyn Smith was also traveling on Highland Avenue at the same time. She was driving south when she watched a northbound green car attempt to turn left in front of her, although there was no driveway to enter. The driver then corrected the vehicle

> at the last moment and came north halfway in [her] lane and halfway in the turning lane in the center, and then he tried [sic] get over into his northbound lane and got halfway into it and then all of a sudden he swerved very fast behind [her] and the car behind [her] and went over into the first lane . . . and hit head-on into a car. It was so hard, his car stood up on its nose and [she] could see the whole bottom of the car, all four wheels and everything, and then it fell over to the side of the curb.

She opined that the Defendant's driving was reckless unless he was suffering from a medical condition.

Nancy Gilman also testified regarding the Defendant's driving that day. She was traveling north on Highland Avenue and saw a car "coming real fast . . . ." She took evasive measures to avoid an accident with this vehicle. She then observed the car cross over the center lane into oncoming traffic and collide with the van. She estimated that the Defendant's vehicle was traveling approximately sixty miles per hour. Ms. Gilman also testified that she did not observe the brake lights ever activate on the Defendant's vehicle. Likewise, Ms. Gilman also classified the Defendant's driving as reckless. According to Ms. Gilman, the Defendant should "have been able to save the car before going into the oncoming traffic."

Sandra Thomas was also present. She was traveling north at a speed of fifty miles per hour when the Defendant's vehicle passed her. The car "went to the left at a very fast speed" and that is when the wreck occurred. She testified that "[t]here were never any brake lights." She stopped her vehicle and went to render aid to the injured occupants of the vehicles; Ms. Thomas had previously been employed as a nurse. Ms. Thomas assisted in removing Mr. Vinson from the vehicle and laying him on the ground where he died. She prayed with Mrs. Vinson until emergency personnel arrived on the scene. Ms. Thomas did not recall smelling alcohol about the car. She believed that the driver must have fallen asleep at the wheel.

Lieutenant Hale was qualified as an accident reconstruction expert. After examining the scene in this case, Lt. Hale determined that there was no evidence of skid marks or braking by the Defendant's vehicle. Additionally, he determined that the Defendant made a forty-five-degree turn into the southbound lane of travel. Lt. Hale could not estimate the speed the vehicles were traveling, but he opined that the Defendant's car had more momentum than the Vinsons' van. Sergeant Johnny Jines of the Jackson Police Department was also a member of the reconstruction team. Sgt. Jines testified that, under normal conditions, an individual would have had time to brake before the point of collision with the Vinsons' van.

Testing of the Defendant's blood sample revealed that his blood alcohol content at 5:40 p.m. was .0596%. Special Agent Robert Marshal of the Tennessee Bureau of Investigation (TBI) testified that, based on his experience, a blood alcohol content of .05% would affect one's critical judgment and reaction time. According to Agent Marshal, "[a]s a general rule, when an individual stops drinking, one hour after they stop drinking they will reach their peak. . . . And then preceding that next hour preceding reaching your peak, you will drop between a range of .01 or .02 and we use an average of .02 per hour." Agent Marshal, through the process of extrapolation, opined, "[I]f the subject stopped drinking at 3:30 . . . in essence if you are at .0596 at 17:40, if you go back one hour, you will have to go back up and add on 0.02 that will be 0.0796 so right around 0.08." Agent Marshal testified that this "would be the average" and acknowledged that some individuals metabolize alcohol faster than others.

Small amounts of antidepressants, amitriptyline and nortiptyline — known as Elavil, were also present in the Defendant's blood. The amount of antidepressants in the Defendant's blood sample was "less than [the] lowest standard." Special Agent Bethany Peterson of the TBI testified that "alcohol will enhance the effects of the drug . . . ."

The accident scene was videotaped, including the beer cans in the cooler. This videotape was played for the jury.

The Defendant testified on his own behalf. He testified that he drove to Jackson on March 25, 2004, because his wife had an appointment with her attorney. The Defendant's wife, Clayola Harris, cared for Ms. Fritz during the day.

According to the Defendant, prior to leaving for the appointment, he ate lunch between 10:30 and 11:00 a.m. He testified that, along with his lunch, he "drank a beer and two-thirds . . . ." The Defendant also testified that the cooler which contained beer was left in the car after a weekend trip. Furthermore, the Defendant stated that he had "a lot of practice" with alcohol. He testified, "I have worked in electrical engineering with equipment and everything with alcohol in my system and never had an accident." The Defendant admitted that, in 1996, he had been adjudicated a habitual motor vehicle offender based upon convictions for driving under the influence of an intoxicant (DUI). According to the Defendant, his license was reinstated in 2000.

He explained that he took the antidepressant drugs for headaches. The Defendant testified that he still had headaches and there have been occasions where he "blacked out" at his home.

The Defendant testified that he did not recall weaving in and out of traffic and he had no memory of the accident. He also did not remember talking to the police at the hospital.

Following the conclusion of the proof, the Defendant was found guilty as charged and, thereafter, the trial court merged the reckless driving conviction with the felony reckless endangerment conviction. A sentencing hearing was held on August 29, 2005, after which the trial court imposed an effective twenty-four-year sentence as a Range I, standard offender to be served in the Department of Correction. Judgments of conviction were entered on September 2, 2005, and a motion for new trial and correction of sentence was filed on October 5, 2005. The motion was denied, and this appeal followed.[3]

## ANALYSIS

### I. Sufficiency of the Evidence

As his first issue on appeal, the Defendant challenges the sufficiency of the convicting evidence for his vehicular homicide and aggravated assault convictions.[4] Specifically, he contends that the evidence was insufficient to establish his reckless conduct in the operation of the vehicle:

---

[3]We note that the notice of appeal was not timely filed. We have decided to waive the timely filing of the notice of appeal in the interests of justice.

[4]The Defendant does not challenge his convictions for felony reckless endangerment or violation of the open container law.

[The Defendant] testified that he had no memory of the incident because of his headaches, which in his view caused him to lose consciousness while driving. The State was unable to prove that [the Defendant] was legally intoxicated, and no State's witnesses could determine what transpired in [the Defendant's] vehicle immediately preceding that crash. While police officers testified that they saw beer cans behind the driver's seat, the temperature of the cans was not obtained, thereby leading to no conclusion that [the Defendant] was drinking immediately prior to the crash. Furthermore, no witness observed the activation of [the Defendant's] brake lights, lending further credence to the theory that [the Defendant] simply "passed out" at the wheel and collided with the Vinsons' van. Finally, all testimony concerning blood alcohol levels and any possible "multiplier effect" of alcohol and antidepressants was speculative and cumulative.

. . . .

. . . [The Defendant] . . . testified that he had not drank alcohol since 11:00 a.m., approximately four and a half hours before the crash. As such, [the Defendant's] conduct was not reckless . . . .

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, and all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

The Defendant was convicted of vehicular homicide by reckless conduct. "Vehicular homicide is the reckless killing of another by the operation of an automobile . . . [a]s the proximate result of conduct creating a substantial risk of death or serious bodily injury to a person . . . ." Tenn. Code Ann. § 39-13-213(a) (2003). To obtain a conviction for aggravated assault by reckless conduct, the State must prove that a criminal defendant (1) recklessly committed an assault and (2) caused serious bodily injury to another or used or displayed a deadly weapon. Id. § 39-13-102(a)(2) (2003); see generally § 39-13-101(a)(1) (2003) (defining assault as "intentionally, knowingly or recklessly caus[ing] bodily injury to another"). In the context of these crimes, the term "reckless"

> refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Tenn. Code Ann. § 39-11-106(a)(31) (2003). "Serious bodily injury" means "bodily injury which involves . . . [a] substantial risk of death[, p]rotracted unconsciousness[, e]xtreme physical pain[, p]rotracted or obvious disfigurement[,] or [p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." Id. § 39-11-106(a)(34).

The evidence established that, on March 25, 2004, at approximately 3:30 p.m., the Defendant was traveling north on Highland Avenue in his green Ford Taurus. Witnesses testified that the Defendant was driving at a high rate of speed and weaving in and out of traffic. At some point, the Defendant appeared to be attempting to turn left across southbound traffic, and southbound drivers were required to take evasive action. The Defendant looked to be correcting his vehicle, when he made a sudden, sharp turn into the southbound lane where he collided with the Chrysler minivan driven by Charles Vinson. Both Charles Vinson and Clayola Harris died at the scene; Bennie Vinson was severely injured and died approximately two months later as a result of her injuries. Sara Fritz had to be extricated from the vehicle, and she suffered a fractured femur requiring surgery.

Two hours after the accident, the Defendant's blood alcohol concentration was .0596%, and antidepressants were present in his blood sample. Agent Marshal testified that the Defendant's blood alcohol level at the time of the accident was likely to be "0.0796 so right around 0.08." Agent Marshal also testified to the effects of alcohol at different concentrations, stating that, even at .05%, a person could be impaired. According to Agent Peterson, alcohol would enhance the effects of the antidepressants. Additionally, empty and full beer cans were located in the Defendant's vehicle, and Officer Moss smelled the odor of alcohol emanating from the Defendant at the hospital. The Defendant himself testified that he had been drinking on the day of the accident.

The Defendant contends that his level of intoxication, .05%, does not explain driving in such an erratic manner but, rather, he argues that he must have "passed out" at the wheel from his medical condition. He points to the facts that officers were unable to testify regarding the temperature of the

beer cans found in his vehicle, that none of the witnesses saw the activation of the Defendant's brake lights, that none of the witnesses were able to observe the Defendant himself prior to the crash, and that the Defendant had no memory of the event. He also submits that testimony extrapolating his blood alcohol level back to the time of the collision and the synergistic effect of alcohol and antidepressants was "speculative and hypothetical."

The jury was free to accept the Defendant's theory and his account of the events leading up to the accident, or the jury was free to fully accredit the theory presented by the State and disregard the Defendant's assertions. State v. Tyler Stout Smith, No. M2004-03048-CCA-R3-CD, 2006 WL 359675, at *6 (Tenn. Crim. App., Nashville, Feb. 16, 2006) (citing State v. Summerall, 926 S.W.2d 272, 275 (Tenn. Crim. App. 1995)). As evidenced by its verdict, the jury chose to accredit the theory of the prosecution. See id. at *5-6 (evidence was sufficient to support vehicular homicide by recklessness conviction where defendant was "swerving erratically, driving in the emergency lane, and attempting to pass in the oncoming lane of traffic without regard for the double yellow line"); see also State v. Thomas Len Profitt, No. E2002-02396-CCA-R3-CD, 2004 WL 298377, at *5-6 (Tenn. Crim. App., Knoxville, Feb. 17, 2004) (evidence was sufficient to sustain conviction for aggravated vehicular homicide by intoxication and knowing aggravated assault where defendant inexplicably drove into oncoming traffic and struck the victim's vehicle, seriously injuring the driver and killing the passenger; three hours after the accident, defendant's blood alcohol concentration was .05 %, and an expert testified that defendant's blood alcohol level at the time of the accident was likely to have been in the range of .086% to .122 %). We conclude that the evidence is sufficient to support the jury's determination that the Defendant was reckless in his operation of the vehicle, and the Defendant is not entitled to relief on this issue.

## II. Sentencing

The trial court imposed the maximum sentence in the range for each felony offense–six years for each of the three vehicular homicide convictions, four years for the aggravated assault conviction, two years for the reckless endangerment conviction–and thirty days for the misdemeanor offense of violating the open container law. The sentences for vehicular homicide, aggravated assault, and reckless endangerment were to be served consecutively to one another and concurrently with the sentence for violation of the open container law, resulting in a total effective sentence of twenty-four years as a Range I, standard offender in the Department of Correction.

The Defendant's sentencing argument is two-fold. He contends that the length of each felony sentence was excessive and that consecutive sentencing was not justified under the facts. Specifically, he makes the following argument:

> The trial court's sentences were excessive. [The Defendant] presented his age, health and alcohol consumption as mitigating factors, which the court only gave slight weight. [The Defendant], at the time of sentencing, was sixty-three years old and had been suffering from cancer. The trial court also erred in finding that [the Defendant] was a dangerous offender as well as an offender with an extensive criminal history. [The Defendant's] criminal activity in this case was only determined to be reckless,

-8-

not intentional or even knowing. In addition, [the Defendant] had only one felony conviction and eleven misdemeanor convictions, and he was sixty-one years old at the time of the crash with the Vinsons. For the foregoing reasons, the trial court erred in ordering that these sentences run consecutive.

Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; and (f) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b) (2003);[5] State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002). To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. State v. Samuels, 44 S.W.3d 489, 492 (Tenn. 2001).

Upon a challenge to the sentence imposed, this court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d) (2003). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then the presumption is applicable, and we may not modify the sentence even if we would have preferred a different result. State v. Fletcher, 805 S.W. 2d 785, 789 (Tenn. Crim. App. 1991). We will uphold the sentence imposed by the trial court if (1) the sentence complies with the purposes and principles of the 1989 Sentencing Act and (2) the trial court's findings are adequately supported by the record. State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). The burden of showing that a sentence is improper is upon the appealing party. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments; Arnett, 49 S.W.3d at 257.

The presentence report reflects that the Defendant was sixty-three years old at the time of sentencing. He did not finish high school but received his G.E.D. He served in the United States Army and the United States Marine Corps for approximately seven years and was honorably

---

[5]We note that the legislature has recently amended several provisions of the Criminal Sentencing Reform Act of 1989, said changes becoming effective June 7, 2005. However, the Defendant's crimes in this case occurred prior to June 7, 2005, and the Defendant did not elect to be sentenced under the provisions of the act by executing a waiver of his ex post facto protections. See 2005 Tenn. Pub. Acts ch. 353 § 18. Therefore, this case is not affected by the 2005 amendments, and the statutes cited in this opinion are those that were in effect at the time the instant crimes were committed.

discharged in 1964. The Defendant had been receiving disability income for several years prior to his arrest. He had three adult children from a prior marriage, with whom he had not had recent contact.

## A. Length of Sentence

The presumptive sentence to be imposed by the trial court for a class C, D, or E felony is the minimum sentence within the applicable range unless there are enhancement or mitigating factors present. Tenn. Code Ann. § 40-35-210(c) (2003). When there are enhancement factors and no mitigating factors, the court may sentence above the minimum in the range. Id. § 40-35-210(d). If both enhancement and mitigating factors are present, the court must start at the minimum sentence, enhance as appropriate for enhancement factors, and then reduce the sentence as appropriate for applicable mitigating factors. Id. § 40-35-210(e).

The trial court applied enhancement factor (2)–a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range– and factor (9)–a previous unwillingness to comply with the terms of release into the community. Id. § 40-35-114(2), (9) (2003). In addition, the trial court applied factor (7)–the amount of damage to property sustained by or taken from the victim was particularly great–to counts one and two, concluding that the damage to the Vinsons' vehicle, estimated to be valued at $9300[6] and completely destroyed in the collision, was great. Id. § 40-35-114(7). The court gave great weight to factors (2) and (9).[7]

The trial court's findings are supported by the record. The presentence report admitted into evidence established that the Defendant had one prior felony conviction for burglary and eleven misdemeanor convictions consisting of convictions for aggravated criminal trespass, public intoxication, DUI, driving on a revoked license, and violation of the open container law. The report also showed that the Defendant was found to be in violation of his probation for driving on a revoked license and DUI and was ordered to serve his original sentence. Additionally, the Defendant admitted to a history of alcohol abuse. Moreover, this Court has previously upheld the trial court's application of enhancement factor (7) where a vehicular assault victim's car was totaled during the wreck. See State v. John D. Neblett, No. 01C01-9805-CC-00231, 1999 WL 743633, at *3 (Tenn. Crim. App., Nashville, Sept. 24, 1999) (factor was applicable to enhance a sentence for vehicular assault because the victim's car, valued at approximately eight thousand dollars, was totaled as a result of the accident with the defendant). In our view, the record supports the trial court's application of factors (2), (7), and (9).

The trial court, relying on the catch-all mitigator of Tennessee Code Annotated section 40-35-113(13), made the following findings in mitigation:

---

[6] It appears that this information is taken from the victim impact statement of Bruce E. Vinson.

[7] The State also contends that the trial court applied enhancement factor (4)-the offense involved more than one victim-to the Defendant's conviction for felony reckless endangerment. See Tenn. Code Ann. § 40-35-114(4). However, based upon our review of the sentencing hearing, we conclude that the trial court did not intend to apply this factor to this conviction, and the State's error appears to be based upon a clerical mistake in the transcript.

[T]he Court finds that perhaps there are two mitigating factors: One being that it does appear that [the Defendant] did serve in the military and served in the Army from 1957 to 1960. For about three years it looks likes [sic] he served in the Army and then later from 1960 to 1964 he served in the United States Marine Corp and was honorably discharged from the Marine Corp in June of 1964. . . . I will give that moderate weight in this case. Also, his health. It does appear . . . that [the Defendant] is currently suffering from cancer of the larynx. . . . Of course, it talks about other medical problems that he has here in the presentence report: His hypertension, urinary tract infection, it looks like he's had bilateral knee replacements and also cervical disc surgery. So, I mean, he's had medical problems which obviously the Court will consider that as mitigating in his behalf. I'm going to give it slight weight.

The trial court then stated that "the enhancing factors clearly, clearly outweigh any mitigation in this case. Again, the reason being is because of this prior history of criminal convictions and criminal behavior."

The Defendant asserts that the trial court failed to properly weigh the enhancing and mitigating factors and that the sentences imposed are excessive. Notably, the Defendant does not contest the accuracy of the trial court's application of the enhancement factors, only the weight afforded to those factors. However, the weight to be assigned to the appropriate enhancement and mitigating factors falls within the sound discretion of the trial court so long as that court complies with the purposes and principles of the 1989 Sentencing Act and its findings are supported by the record. State v. Boggs, 932 S.W.2d 467, 475 (Tenn. Crim. App. 1996). It is clear from the record that the trial court thoroughly considered the purposes and principles of the Act. Considering the strength of the enhancement factors, we conclude that the trial court properly sentenced the Defendant to the maximum in the range for each felony conviction.

## B. Consecutive Sentencing

The Defendant contends that the trial court erred in ordering the sentences for vehicular homicide, aggravated assault, and felony reckless endangerment to be served consecutively to one another. Tennessee Code Annotated section 40-35-115(b) provides that it is within the trial court's discretion to impose consecutive sentencing if it finds by a preponderance of the evidence that any one of the following criteria applies:

(1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b) (2003). These criteria are stated in the alternative; therefore, only one need exist to support the imposition of consecutive sentencing. State v. Adams, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997).

In State v. Wilkerson, our supreme court imposed two additional requirements for consecutive sentencing when the "dangerous offender" category is used: The court must find consecutive sentences are reasonably related to the severity of the offenses committed and are necessary to protect the public from further criminal conduct. State v. Wilkerson, 905 S.W.2d 933, 937-38 (Tenn. 1995). Although such specific factual findings are unnecessary for the other categories enumerated in Tennessee Code Annotated section 40-35-115(b), the imposition of consecutive sentences is also "guided by the general sentencing principles that the length of a sentence be 'justly deserved in relation to the seriousness of the offense' and 'no greater than that deserved for the offense committed.'" Imfeld, 70 S.W.3d at 708 (quoting Tenn. Code Ann. §§ 40-35-102(1), -103(2)); State v. Lane, 3 S.W.3d 456, 460 (Tenn. 1999)).

The record reveals that the trial court relied on two factors in determining that consecutive sentencing was warranted in this case–the Defendant's criminal history was extensive and the Defendant was a dangerous offender. As to the Defendant's extensive criminal history, the trial court recited the Defendant's criminal record — one felony and eleven misdemeanors, including three prior convictions for DUI. The trial court made the following conclusions:

Now, when you take all that into consideration along with the fact that here's a man with three prior DUI convictions; here's a man that's been placed on probation before and has gone out and committed more DUI's while on probation for DUI; you know, you've got to look at this and understand that [the Defendant] has a problem. He's an alcoholic. No question about it. Even by his testimony or this information in this presentence report, this is a man that has consumed alcohol on a daily basis for many years. . . . You know, this is the type of person that [the Defendant] is, a longtime alcoholic that has gone out on numerous occasions and violated the law by drinking

-12-

and driving and unfortunately on this occasion killed three innocent people, his wife and two other innocent people.

. . . The Court finds that confinement is necessary to protect society from a defendant who has a long history of criminal record especially drinking and driving.

The trial court noted that, even though the Defendant was not charged with vehicular homicide by intoxication, "[c]learly intoxication was part of the reckless conduct out there that day and the court finds that to be important under the facts and circumstances of this case." We conclude that the record contains sufficient evidence of the Defendant's prior criminal history to support the court's imposition of consecutive sentences based on an "extensive" criminal record.

The trial court also found that the Defendant was a "dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high." Tenn. Code Ann. § 40-35-115(b)(2). The trial court gave a thorough recitation of the facts and, although not specifically stated, inferred that consecutive sentencing was reasonably related to the severity of the crimes. The trial court made many findings inferring this conclusion, including: "[T]aking into consideration all of the motorists that were placed in danger out there that day and taking into consideration that you have three individuals whose lives ended as a result of his actions out there that day[,]" the "Court finds that confinement is necessary to avoid depreciating the serious[ness] of these offenses." As to the second Wilkerson factor, the trial court stated that an extended sentence was necessary to protect the public from further criminal conduct, noting that the Defendant has a long criminal history of drinking and driving. Furthermore, the trial court observed, "If he is consuming 10 to 12 beers on a daily basis, there is no doubt that he would probably commit this offense again if given the opportunity." Additionally, the court noted that measures less restrictive than confinement have been unsuccessful "because he has continued to drink and drive . . . ." Upon de novo review, we conclude that the evidence contained in the record supports the trial court's finding as the proof established that the aggregate sentence imposed is justly deserved and no greater than that deserved for the offenses committed. Therefore, we affirm the imposition of consecutive sentences.

**CONCLUSION**

Based on the foregoing reasoning and authorities, we conclude that the evidence is sufficient to support the convictions for vehicular homicide and aggravated assault and that the sentence as imposed was not excessive. The judgments of the Madison County Circuit Court are affirmed.

_____
DAVID H. WELLES, JUDGE

-13-